

## AGREEMENT

AGREEMENT as of the 1st day of October 1999 by and between Health Management Systems, Inc., a New York corporation ("HMS"), with offices located at 401 Park Avenue South, New York, New York 10016, and Davis & Associates, Inc., a District of Columbia corporation ("D&A"), with offices located at 919 18th Street N.W., Suite 400, Washington, D.C. 20006.

WHEREAS, HMS furnishes proprietary information management and data processing products and services to hospitals and other healthcare providers, which products and services enhance the revenue realized by such providers ("HMS Provider Clients"); and

WHEREAS, D&A furnishes proprietary services to public, private and parochial primary and secondary schools ("Schools"), which services ("Revenue Recovery Services") enhance the revenue received by such entities for the delivery of health services; and

WHEREAS, HMS and D&A have been and are currently working together in connection with certain HMS Provider Clients and Schools clients; and

WHEREAS, HMS and D&A each desire to expand the existing business relationship and to form an alliance pursuant to which they will jointly market and deliver Revenue Recovery Services to existing and potential future Schools clients; and

WHEREAS, HMS and D&A each desire to set forth the terms and conditions of their alliance and to supersede and replace all currently existing arrangements related to Schools, both formal and informal, and covering HMS Provider Clients, the District of Columbia General Hospital and District of Columbia Neighborhood Health Centers (the "Prior Agreements");

NOW, THEREFORE, in consideration of the mutual promises herein contained, the parties hereto agree as follows:

1. <u>Term of Agreement</u>. The initial term of this Agreement (the "Term") shall commence as of the date hereof and shall terminate on October 31, 2002, unless sooner terminated by either HMS or D&A as provided in Section 5 hereof. Thereafter, annual renewal term(s), if any, of this Agreement shall require the prior written approval of the parties.

2. <u>Responsibilities of the Parties</u>. The responsibilities of HMS and D&A in respect of services to be provided by each of them pursuant to this Agreement are set forth in Schedules A

(Services to Schools and District of Columbia Providers) and B (Organizational/Operational Protocols). Services to Schools and HMS District of Columbia Provider Clients encompasses either or both of (i) transaction based claims related to the billing of individual services and (ii) administrative/cost based claims. Education services to Schools includes both regular and special education.

3. <u>Financial Arrangement Between HMS and D&A</u>.

(a) <u>Definitions</u>.

(i) "Gross Contract Revenue" with respect to any client shall equal the revenue paid to and actually received by HMS or D&A, as the case may be, in its capacity as the prime contractor pursuant to client contracts covered by this Agreement.

(ii) "Approved Expenses" shall mean those direct and indirect operating expenses and capital expenditures related to a specific client which are (x) included within an annual budget delineated by month as approved by HMS and D&A (subject to quarterly revision as provided in Section 3(b)(ii) of this Agreement) and (y) actually incurred. Direct operating expenses shall include, but are not limited to, the marketing fees and expenses of all consultants approved in advance by both parties. Indirect operating expenses included in a budget with respect to a specific client shall be allocated in accordance and otherwise comply with Generally Accepted Accounting Principles ("GAAP") and shall not exceed the direct operating expenses (excluding approved consultants) included in that budget. Periodic repayments of depreciation expense for equipment purchased by D&A and installed at client sites pursuant to this Agreement shall be calculated in equal amounts over a period of 36 months. An appropriate expense item covering periodic repayments in the case of equipment purchased by D&A and lease payments in the case of equipment leased by D&A shall be included in the budget covering each respective client as an Approved Expense.

(iii) "Operating Margin" with respect to any client shall be equal to Gross Contract Revenue minus Approved Expenses.

(b) <u>Compensation</u>.

(i) <u>Revenue Recovery Services to Existing Clients of HMS or D&A</u>. Gross Contract Revenue from existing clients of HMS or D&A covered by this Agreement is to be allocated as set forth in Schedule C (Compensation), with each party bearing its own costs, except that any marketing fees and expenses of consultants approved in advance by both parties and incurred in the future will be deducted from Gross Contract Revenue prior to such allocation.

(ii) <u>Revenue Recovery Services to Future Schools Clients</u>. In the future, where HMS and D&A undertake to furnish services to Schools, Gross Contract Revenue is to be allocated on the basis of an agreed upon scope of work, against the satisfaction of which a budget is to be prepared jointly (and shall be subject to quarterly revisions as provided below), which budget shall reflect all direct costs (including the marketing fees and expenses of approved consultants and periodic repayments of depreciation expense for equipment installed at client sites) and specified indirect expenses required by and properly chargeable to the engagement. Except as otherwise set forth in the budget, each party will bear fully its own costs and expenses. It is expected that the "Operating Margin" generated by each such engagement will be split between HMS and D&A, depending upon which of HMS and D&A is the prime contractor, as set forth in Schedule C (Compensation).

Any expense incurred by a party in excess of the agreed upon budget for a cost category (except for such expenses incurred as a result of an agreed upon revision to the scope of the engagement and a consequent agreed upon revision to the budget) shall be borne entirely by the party incurring such excess expenses. The cost categories to be included in agreed upon client budgets shall consist of (i) personnel services and all expenses directly related thereto, (ii) marketing expenses, (iii) capital expenditures, including, but not limited to, equipment to be installed at client sites, and (iv) other expenses not included in any of the other cost categories.

In addition to the foregoing, annual client budgets approved by HMS and D&A shall be subject to review and revision on a quarterly basis, with HMS having the right, to be exercised in good faith and after due consultation with D&A and a reexamination of the factors which led to the original budget, to make such reasonable revisions to annual client budgets as HMS shall determine to be appropriate; provided, however, that the parties shall mutually agree to such revisions at all budget

reviews occurring when HMS has not had any outstanding advances to D&A for the six months preceding the date of the quarterly review.

(c) <u>Distributions</u>. No distribution of Operating Margin with respect to the Gross Contract Revenue received for any client shall be made to HMS or D&A until (i) each of HMS and D&A shall have received full reimbursement for its actually incurred or accrued direct and indirect operating expenses, including periodic repayments of depreciation expense for equipment installed at client sites, included in the approved budget with respect to that client, (ii) HMS shall have received, pursuant to Section 3(g) hereof, repayment from D&A of advances for Operating Expenses and to purchase or lease equipment, in each case with respect to that client, plus accrued but unpaid interest thereon, and (iii) all approved consultants shall have been paid all then outstanding amounts owed to them. In addition, no distributions shall be made to D&A if D&A is delinquent in any of its financial obligations to HMS, whether arising under this Agreement or otherwise and all distributions are subject to the provisions of Sections 3(g)(i) and (ii) and 3(h) hereof.

(d) <u>Equipment Installed at Client Sites</u>. Unless otherwise agreed by the parties, D&A shall purchase and retain ownership of or lease all equipment to be installed at client sites. The cost or lease expense, as applicable, of such equipment shall be included in the client specific budgets to be approved by HMS and D&A.

(e) <u>HMS Advances to D&A</u>. Notwithstanding Section 3(d) hereof, at the request of D&A (to be made quarterly), HMS shall advance to D&A all direct and indirect operating expenses of D&A included in approved budgets. HMS's responsibility for advancing D&A's operating costs under this Agreement shall continue only until such time as the parties determine in good faith that D&A has sufficient cash flow that it will be able to finance its own operating expenses. In addition, if requested by D&A, HMS may advance funds to D&A to acquire or lease equipment for installation at client sites and included in budgets approved by HMS and D&A. HMS shall not unreasonably withhold its consent to such requests for funds; provided, however, that at no time shall HMS be required to make any advances pursuant to this Section 3(e) if such advances would result in the total amount of such outstanding unpaid advances being in excess of $500,000. All advances to D&A shall bear interest at the prime rate of interest announced from time to time by Chase Manhattan Bank plus 1.0%. Advances by HMS to D&A for budgeted operating expenses and

equipment to be installed at client sites may be drawn down quarterly, with D&A providing monthly reports to HMS and quarterly reconciliations of amounts expended versus the agreed upon budget; provided, however, that at such time as the amount of the advances exceeds a specified dollar number (to be determined and subject to periodic reconsideration by HMS) or if HMS otherwise determines it necessary, HMS may require monthly advances and monthly reconciliations. D&A agrees to grant HMS a purchase money security interest in all equipment purchased with funds advanced under this Section 3(b)(iv) and in connection therewith D&A agrees to execute, prior to such advances, an appropriate Security Agreement and such other documents as HMS shall reasonably determine in order to perfect HMS's purchase money security interest in the purchased equipment. In addition, HMS shall not be obligated to make any advances to D&A if D&A is delinquent in any of its performance obligations to HMS under this Agreement or financial obligations to HMS, whether arising under this Agreement or otherwise. All unpaid advances, together with accrued but unpaid interest related thereto, shall become due and payable in full and not subject to the limitations set forth in Section 3(g) of this Agreement, 60 days following HMS's termination of the Agreement for "cause," as herewith defined, or D&A's termination of the Agreement for convenience, 90 days following HMS's or D&A's termination of the Agreement for "reasonable cause," as herewith defined, and 120 days following HMS's termination of the Agreement for convenience or because of the death, disability or cessation of substantially full-time active management participation of Michael L. Davis with D&A or D&A's termination of the Agreement for cause; provided, however, HMS advances (and all related accrued but unpaid interest related thereto) in connection with any client contracts for which HMS and D&A continue to work together following expiration or termination of this Agreement shall continue to be repaid as provided in Section 3(g) of this Agreement as though this Agreement had not been terminated. In addition, for purposes of repayment of advances and payment of accrued but unpaid interest related thereto pursuant to this Section 3(e) and other than in the case of a termination by HMS for "cause" or a termination by D&A for convenience, D&A shall receive as a credit against advances (and interest) owed to HMS, D&A's proportionate share of undisputed and collectable client receivable then outstanding or related to work completed through the date of termination which would be distributable, upon collection thereof, to D&A as its share of Operating Margin.

(f) *Disallowance of Fees*. Should any portion of the recoveries secured by HMS and D&A under client contracts covered by this Agreement be disallowed on audit, an appropriate pro rata

refund will be made to the party having the prime contract of the refunding party's share of the disallowed fees within thirty (30) days of such party's receipt of notification of such disallowance.

   (g)   **D&A Repayment of Advances and Payment of Interest**.

      (i)   **Advances for Operating Expenses**. HMS advances to cover direct and indirect operating expenses of D&A included in budgets approved by HMS and D&A will be repaid to HMS, together with all accrued but unpaid interest thereon, from Gross Contract Revenue received from the respective client for which the expenses were incurred and will be paid to HMS prior to the distribution of Operating Margin to HMS or D&A with respect to the Gross Contract Revenue received from that client; provided, however, that such advances, together with all accrued but unpaid interest thereon, which are outstanding for more than nine months shall be paid to HMS from Gross Contract Revenue received from any client whose contract is covered by this Agreement prior to the distribution of Operating Margin to HMS and D&A pursuant to Section 3(c) of this Agreement. D&A shall have the right at any time to repay such advances, in whole or in part, from any other sources.

      (ii)   **Advances to Purchase or Lease Equipment**. HMS advances to purchase or lease equipment for installation at client sites and included in budgets approved by HMS and D&A will be repaid based upon the scheduled periodic repayments of depreciation expense or lease payments for equipment installed at the respective client site and together with all accrued but unpaid interest thereon (provided D&A is not in default on any financial obligation to HMS, whether arising under this Agreement or otherwise) from Gross Contract Revenue received from the client for which the equipment has been installed, and will be paid to HMS prior to the distribution of Operating Margin to HMS or D&A with respect to the Gross Contract Revenue received from that client; provided, however, that such advances, together with all accrued but unpaid interest thereon, for which scheduled periodic repayments of depreciation expense or lease payments are outstanding for more than nine months shall be paid to HMS, to the extent of such past-due scheduled periodic repayments, from Gross Contract Revenue received from any client whose contract is covered by this Agreement prior to the distribution of Operating Margin to HMS and D&A pursuant to Section 3(c) of this Agreement. D&A shall have the right at any time to repay such advances, in whole or in part, from any other sources. Unless the parties otherwise agree in writing, any advances to purchase or lease

equipment for installation at client sites (i) which are not used to purchase or lease the specified equipment or (ii) as to which the equipment purchased or leased with the advances is not installed at the designated client site, shall be returned to HMS by D&A, together with interest thereon, not later than forty-five (45) days following the date of the respective advance.

(h) <u>Pre-contract Marketing Expenses</u>. D&A shall prepare a budget, which may be supplemented by D&A from time to time, covering estimated marketing expenses expected to be incurred before the award of any additional contracts covered by this the Agreement. These marketing expenses will include out-of-pocket expenses and personnel compensation costs based upon actual time spent at a rate equal to annual compensation of any such personnel divided by 2000 hours. Pre-contract marketing expenses will be mutually agreed upon, including any additional pre-contract marketing expenses submitted by D&A after the date hereof, based on the type of proposed engagement, the projected revenue estimated to be available under a proposed engagement and other relevant considerations. Approved pre-contract marketing expenses will be advanced by HMS and will be reimbursed from Gross Contract Revenue derived from the client contract resulting from those expenses before distribution of Operating Margin to the parties. If no client contract is awarded within six months following commencement of marketing efforts, the parties will bear responsibility for the expended pre-contract marketing expenses related to that unsuccessful effort in the same proportion as their sharing of Operating Margin would have been (as set forth in Schedule C (Compensation) to the Agreement) had a client contract been awarded. HMS advances of D&A's share of pre-contract marketing expenses related to unsuccessful marketing efforts will be repaid to HMS from the portion of Gross Contract Revenue or Operating Margin, as the case may be, distributable to D&A in accordance with this Agreement until such time as all such advances have been repaid in full and prior to any such distributions to D&A. In addition, D&A shall prepare an itemization (including the name of the prospective client and the commencement date of marketing efforts) of marketing expenses incurred prior to the date of this Agreement, about which HMS and D&A shall mutually agree upon the extent of HMS's participation. HMS's participation in such marketing expenses shall be paid to D&A in cash (x) upon execution of this Agreement or (y) with respect to additional pre-contract marketing expense budgets submitted by D&A subsequent to the date hereof and approved in writing by the parties, upon approval thereof.

4. <u>D&A Equity Interest in HMS</u>. In order to promote interest on the part of D&A in HMS's longer term success and to

7

align the interests of both parties, upon D&A's execution of this Agreement, HMS will grant to D&A, pursuant to HMS's 1999 Long-Term Incentive Stock Plan and evidenced by HMS's standard Stock Option Agreement, non-qualified options to purchase 20,000 shares of HMS common stock at an exercise price equal to the then fair market value of the shares. One-fifth of such options shall vest immediately and annually thereafter on October 31 each year commencing October 31, 1999 and ending October 31, 2002, provided that this Agreement shall then be in effect.

5. <u>Termination of Agreement</u>.

(a) <u>Termination for Convenience</u>. Either party may terminate this Agreement at any anniversary date hereof by providing the other party hereto not less than thirty (30) days prior written notice of its intention to terminate.

(b) <u>Termination for Cause</u>.

(i) Either party may terminate this Agreement for "cause". For purposes of this Agreement, "cause" shall mean conviction of a felony or a crime of moral turpitude, a showing by clear and convincing evidence of dishonest actions to the material detriment of the other party or a client covered by this Agreement or acts in gross dereliction of a party's duties under this Agreement (excluding payment obligations) and a failure to cure such defects in performance within thirty (30) days after it was first notified by the other party; provided, however, that no default shall exist under this Agreement unless the party claiming default is not itself then in default under this Agreement as a result of a material breach thereof.

(ii) During a period of thirty (30) days following receipt of written notice, each party shall have the opportunity to cure any failure of performance under this Agreement; provided, however, that neither party shall be obligated to accept any such attempted cure if it reasonably determines that, notwithstanding the other party's attempt to cure, it has suffered substantial and quantifiable damages as a result of the other party's failure of performance. Neither party may exercise the foregoing right to cure more than once during the term of this Agreement. In addition, each party shall have the right to terminate for "cause" upon three (3) days written notice in the event the other party or its Chief Executive Officer have been indicted or convicted for a felony offense or a crime of dishonesty or moral turpitude.

(c) <u>Termination for Reasonable Cause</u>.  Either party may terminate this Agreement for "reasonable cause" if the other party shall fail to satisfy timely its performance or payment obligations and/or other duties under this Agreement (which failure does not constitute a basis for termination for "cause") or if such party shall be dissatisfied with the performance of the other party or the results of the strategic alliance between the parties.  A termination by a party for "reasonable cause" must be preceded by written notification to the other party stating the reasons for the termination and by a cure period of not less than two (2) months and not more than six (6) months (the actual duration to be determined by the parties in good faith and predicated upon the nature of the problem and the time reasonably required to effect a cure).  To the extent the problem is not resolved by the end of the agreed upon cure period, the initiating party shall be entitled to proceed with a termination of this Agreement for "reasonable cause".

(d) <u>Termination for Death, Disability or Cessation of Substantially Full-Time Active Management Participation of Davis with D&A</u>.  The death or disability, or cessation of substantially full-time active management participation in D&A of, Michael L. Davis shall constitute termination for reasonable cause by HMS, except that such termination shall be stayed for thirty (30) days for the purpose of providing the parties an opportunity to negotiate, if possible, a satisfactory modification to this Agreement prior to its termination.

6. <u>Effects of Termination or Expiration of Agreement</u>.

(a) <u>Termination for Convenience</u>.  In the event a party shall terminate this Agreement for convenience, at the election of the terminated party, the terminating party shall be obligated to continue to perform under (i) all client contracts then in effect which are covered by this Agreement, and (ii) all such contracts subsequently awarded within six (6) months of the termination of this Agreement and for which a bid was outstanding as of the termination date of this Agreement until the normal expiration of those client contracts.  In addition, the terminating party shall not seek to be awarded any successor contracts to any of the client contracts covered by the immediately preceding sentence within twelve (12) months of their expiration or earlier termination.

(b) <u>Termination for Cause</u>.  In the event a party shall terminate this Agreement for cause, the terminating party shall have no obligation to the terminated party after the termination date (except that this provision shall not affect the obligation

to make distributions from Gross Contract Revenue or Operating Margin, as the case may be, for services performed prior to the termination date, and D&A's obligation to repay all advances from HMS plus accrued but unpaid interest or continuing obligations pursuant to Sections 3(e), (g) and (f), 8, 10, 11 and 13 of this Agreement) and the terminated party shall immediately cease performing services under all client contracts then in effect which are covered by this Agreement and shall have no rights with respect to any subsequently awarded contracts for which a bid was outstanding as of the termination date of this Agreement. In addition, the terminated party shall not seek to be awarded any successor contracts to any of the client contracts covered by the immediately preceding sentence within eighteen (18) months of their expiration or earlier termination.

   (c) <u>Termination for Reasonable Cause</u>. In the event a party shall terminate this Agreement for reasonable cause, at the election of the terminating party, the terminated party shall continue to perform under (i) all client contracts then in effect which are covered by this Agreement and (ii) all such contracts subsequently awarded within six (6) months of the termination of this Agreement for which a bid was outstanding as of the termination date. In addition, the terminated party shall not seek to be awarded any successor contracts to any of the client contracts covered by the immediately preceding sentence within nine (9) months of their expiration or earlier termination.

   (d) <u>Expiration of Term</u>. At the expiration of the term of this Agreement, unless otherwise agreed between the parties, each party shall be obligated to continue to perform under (i) all client contracts then in effect which are covered by this Agreement, and (ii) all such contracts subsequently awarded within six (6) months of the expiration of this Agreement and for which a bid was outstanding as of the expiration date of this Agreement until the normal expiration or earlier termination of those client contracts. Unless otherwise agreed between the parties, upon the expiration of this Agreement, each party shall be free to seek to be awarded successor contracts to the aforesaid client contracts upon their respective expiration or earlier termination.

  7. <u>Right of First Refusal</u>. During the term of this Agreement, each party agrees as follows:

   (a) HMS agrees that it will not provide, or attempt to provide, services similar to Revenue Recovery Services to any Schools or District of Columbia Providers with respect to either or both of transaction based claims or administrative/cost based

10

claims without first giving D&A the right to perform those services pursuant to this Agreement, subject to D&A's ability to commence performance within thirty (30) days of the date of required performance.

(b) D&A agrees that it will not provide, or attempt to provide, any Revenue Recovery Services to any Schools or District of Columbia Providers with respect to either or both of transaction based claims or administrative/cost based claims without first giving HMS the right to perform those services pursuant to the terms of this Agreement, subject to HMS's ability to commence performance within thirty (30) days of the date of required performance.

8. **Non-Solicitation of Employees**. During the term of this Agreement and for a period of twelve (12) months thereafter, neither HMS nor D&A will hire, or attempt to hire, any then currently employed employee of the other party, or any former employee of the other party who was employed by the other party within a twelve (12) month period, without having obtained the other party's prior written approval.

9. **Relationship of Parties**. HMS and D&A agree that in conjunction with any client contracts that are entered into by them pursuant to this Agreement, they will function as independent contractors and each party will be retained solely for the purposes and to the extent set forth in this Agreement and any such client contracts. In this regard, it is mutually understood and agreed that the relationship between HMS and D&A does not constitute an employment arrangement and that neither HMS nor D&A and/or their respective agents, assigns, directors, employees, officers, partners and/or subcontractors will be considered to be employees of the other party, nor to be entitled to any employee benefits, distributions or other remuneration of any kind other than as set forth in Section 3 herein. It is also mutually understood and agreed that HMS and D&A will not be subject to, nor be required to perform in accordance with, any of the employee-related policies or practices of the other party and may dispose of their respective staff's time in such a manner and in such places as each party deems appropriate; provided, however, that each party devotes sufficient time and gives all reasonable efforts to complete its respective duties and obligations to the other party in accordance with this Agreement and/or any applicable client contracts entered into pursuant to this Agreement. In addition, any and all costs, expenses, or liabilities (including but not limited to occupancy and office expenses) incurred by either HMS or D&A in connection with this Agreement and any client contracts covered by this Agreement, and