UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

DAVIS & ASSOCIATES, INC.,

      Plaintiff,

    -v-

HEALTH MANAGEMENT SERVICES, INC.,

      Defendant.

------------------------------------------------------------------X

No. 00 Civ. 6725 (GEL)

OPINION

AND

ORDER

Frederick A. Douglas, New York, NY (Leftwich & Douglas, PLLC, New York, NY), for Plaintiffs Davis & Associates, Inc.

Andrea Fisher, New York, NY (Coleman, Rhine & Goodwin LLP, New York, NY) for Defendant Health Management Systems, Inc.

GERARD E. LYNCH, District Judge:

  Plaintiff Davis & Associates, Inc. ("Davis") sues defendant Health Systems Management, Inc. ("HMS"), on a number of grounds arising from HMS's alleged breach of an agreement to jointly deliver and market revenue maximization services to governmental entities and health care providers. Defendant moves for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, arguing that all claims alleged in the Complaint were the subject of a binding release agreement voluntarily executed by plaintiff in consideration for substantial sums of money. For the reasons stated below, defendant's motion is granted.

## BACKGROUND

I. Facts

Except where noted, the following material facts are not in dispute, or are sufficiently supported by plaintiff's evidence that they must be accepted for purposes of defendant's motion. HMS is a New York corporation engaged in the principal business of furnishing proprietary information management systems and revenue maximization services to healthcare providers and governmental entities. (Bendes Aff. ¶ 5.) Davis is a District of Columbia corporation engaged in the principal business of furnishing proprietary information management systems to public, private and parochial schools and revenue maximization services to governmental entities. (Compl. ¶ 2.) Revenue maximization services generally include careful analysis of documents and billing records with an eye toward locating potential sources for third party funding.

In October, 1999, HMS and Davis concluded an agreement to jointly market and deliver revenue maximization services to existing and potential public, private, and parochial school clients. (Id. Ex. A) ("Schools Agreement.") In April, 2000, HMS and Davis concluded a second agreement, pursuant to which they agreed to jointly provide revenue maximization services to all existing and potential future clients. (Id. Ex. B) ("RevMax Agreement.")[1] Pursuant to the Agreements, HMS was to (a) advance "approved" pre-contract marketing expenses to Davis and (b) advance "approved" marketing and operating expenses for future projects, upon submission by Davis, and acceptance by HMS, of a detailed budget proposal. (Id. Exs. A & B.) HMS was not, however, obligated to make such advance payments in the event the total amount of Davis's

---

[1] The "RevMax Agreement" and the "Schools Agreement" are referred to collectively as "the Agreements."

2

unpaid balance reached $500,000. (Id. Exs. A §3(e) & B §3(e).)[2] Davis was to have primary responsibility for operational aspects of the venture, including selection, approval and supervision of existing and potential clients (id. Ex. B, Schedule A), and was to be given options to purchase a total of 20,000 shares of HMS stock (id. Exs. A §4 & B §4). Davis was further provided with a "right of first refusal," such that HMS agreed not to utilize the services of any subcontractor to provide revenue maximization services without first giving Davis the right to perform such services pursuant to the RevMax Agreement. (Id. § 7(a)).

There is no dispute that between October 1999, through May 31, 2000, HMS advanced funds to Davis in the amount of $1,625,439. (Bendes Aff. ¶ 10; Davis Aff. ¶¶ 9 & 10.) HMS argues that that amount was in excess of what it was contractually obligated to advance under the Agreements. (Bendes Aff. ¶ 10.) Although Davis disagrees (P.'s R. 56.1 Counter Statement ¶ 10), the contractual documents make clear that HMS was not obligated to make payments after Davis's unrepaid advances exceeded $500,000. (Id. Exs. A §3(e) & B §3(e).) HMS never received any revenue – and thus no return on its advance – from any client contracts entered into pursuant to the Agreements. (Bendes Aff. ¶ 15; P's R. 56.1 Counter Statement ¶ 12.) Nor did Davis ever return any of HMS's advance payments. (Id.)

The controversy underlying this case arose after HMS refused to approve budgets for

---

[2] Section 3(e) of both agreements states in relevant part:

    (e) <u>Advances to D&A</u>
    . . . . at no time shall HMS be required to make any advances pursuant to this Section 3(e) if such advances would result in the total amount of such outstanding unpaid advances being in excess of $500,000.

(Comp. Exs. A §3(e) & B §3(e).)

operating and marketing expenses that Davis proposed for various revenue maximization projects. (Compl. ¶ 13.) The parties agree that these preliminary budgets were "not in line with the pro forma budgets which had been previously set forth by HMS," and that "as a result, Davis was notified that such budgets were not approved." (D.'s R. 56.1 Statement ¶ 9; P.'s R. 56.1 Counter Statement ¶ 9.) Davis never submitted revised budget proposals to HMS. (Id.) Nor did HMS propose any. (Id.)

In June 2000, Davis thrice requested additional funding and HMS agreed, but only on condition that Davis waive some of its rights otherwise retained under the Agreements. On June 1, HMS agreed to advance Davis $126,000, but only in exchange for Davis's waiver of its right to receive, pursuant to the agreements, options to purchase shares of HMS common stock. (D.'s R. 56.1 Statement ¶ 13; P.'s R. 56.1 Counter Statement ¶ 13.) On June 16, HMS advanced Davis another $150,000, again upon request by Davis, but this time without an attached condition. (Id. ¶ 15.) Finally, on June 30, HMS agreed to provide Davis with up to $1 million in additional funding, in exchange for Davis's release of HMS from all potential claims that Davis might otherwise have against Davis under the Agreements. (D.'s R. 56.1 Statement ¶ 16; P.'s R. 56.1 Counter Statement ¶ 14.) The release agreement also required that Davis repay in full "all funds made available by HMS . . . since October 5, 1999," and warranted that by July 31, 2000, Davis would either (1) restructure its relationship with HMS, (2) be acquired by HMS or a third party, or (3) terminate its business relationship with HMS (Bendes Aff. Ex. B) ("Release"). HMS immediately advanced Davis an additional $685,000 in exchange for Davis's execution of the Release ("June Funding"). (D.'s R. 56.1 Statement ¶ 16; P.'s R. 56.1 Counter Statement ¶ 14.) These June advances, plus the amounts previously advanced between October 1999, and May 31,

4

2000, brought Davis's total outstanding balance to $2,586,439.

On September 7, 2000, Davis brought this action for inter alia, breach of contract, fraud, interference with contractual relations, interference with prospective economic advantage and an accounting. On November 21, 2000, HMS moved for summary judgment on the ground that Davis has voluntarily released all claims. Davis does not dispute that it executed the Release, or that it received valuable consideration for its execution, but argues that the Release is void on the ground that it was executed under economic duress.

## DISCUSSION

I. Legal Standard

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, the court must resolve all ambiguities in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. See Wernick v. Federal Reserve Bank of New York, 91 F.3d 379, 382 (2d Cir. 1996) (internal citations omitted). The litigant opposing summary judgment "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997) (internal quotation marks and citations omitted). "Summary judgment is improper when the court merely believes that the opposing party is unlikely to prevail on the merits after trial." American International Group, Inc. v. London American International Corp. Ltd., 664 F.2d 348, 351 (2d Cir. 1981). Issues of contract

interpretation (of which there are many on this record) are pure issues of law capable of resolution on summary judgment. See, e.g., Kreiss v. McCown De Leeuw & Co., 131 F. Supp. 2d 428, 435 (S.D.N.Y. 2001).

II. The Release Agreements

"It is well established under New York law that a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between parties." Berman v. Parco, 986 F. Supp. 195, 208 (S.D.N.Y. November 16, 1997) (internal quotation marks and citations omitted). Thus a release is binding on the parties absent a showing of fraud, duress, undue influence, or some other valid legal defense. See, e.g., Worth Construction v. ITRI Masonry Corp., No. 98 Civ. 2536 (CM), 2001 WL 209924, at *5 (S.D.N.Y. February 21, 2001) ("Since a release is a 'jural act of high significance without which the settlement of disputes would be rendered all but impossible . . . the traditional bases for setting aside written agreements, namely duress, illegality, fraud or mutual mistake, must be established or else [it] stands'") (alterations in original) (quoting Mangini v. McClurg, 24 N.Y.2d 556, 563 (1969)).

The release agreement at issue here was unambiguous. Plaintiffs agreed to waive "any claims [Davis] may have against the HMS Releasees as of, or relating to any matters arising or accruing through the date hereof." (Bendes Aff. Ex. B.) The waiver further stated that it was made in confirmation of the parties' prior understandings and made "in exchange for [HMS's] making available up to an additional $1 million of advances for Davis['s] . . . operating expenses in anticipation of [Davis's] formal submission of project budgets for HMS approval." (Id.) There appears to be no dispute that all of plaintiff's causes of action are based on conduct that occurred

6

before the Release was signed, and thus all are unambiguously covered by the Release. Consequently, if the Release is valid, and not voidable on grounds of economic duress, all of plaintiff's claims must be dismissed. See, e.g., 2 Broadway v. Credit Suisse First Boston Mortgage Capital, No. 00 Civ. 5773 (GEL), 2001 WL 410074, at *7 (S.D.N.Y. April 23, 2001).

Moreover, the release agreement was executed in the course of arm's length negotiations by sophisticated commercial actors with substantial expertise in their relevant fields of business. It is plain on the face of the Complaint, and the evidentiary record accompanying the instant motion, that both parties routinely provide substantial revenue maximization services to governmental entities, sophisticated health care providers, public school systems, and individual private and parochial schools. (Bendes Aff. ¶¶ 2 & 3; Compl. ¶¶ 2 & 3.) The parties have been involved with one another in various sub-contractor arrangements since at least 1992 (Davis Aff. ¶ 1), and as early as 1996 "began discussing a global arrangement whereby they would jointly market [sic] schools and state and local health care agencies to provide revenue recovery services" (id. ¶ 2). The Agreements expressly characterize the relationship between the parties as arm's length (Compl. Ex. A & B §9), and set forth the extensive expertise of both parties in their respective fields of client services (id. at p. 1). The Release thus falls squarely within the category of negotiated agreement between sophisticated parties that must be given greatest deference by the Court. See, e.g., Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 695 (1997) ("Freedom of contract prevails in an arm's length transaction between sophisticated parties such as these, and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain").

7

III. Economic Duress

A release agreement may be voided "on the ground of economic duress where the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of his free will." Worth Construction, 2001 WL 209924, at *5 (internal citations and quotation marks omitted). The party seeking to void a release agreement on grounds of economic duress "shoulders a heavy burden." Orix Credit Alliance, Inc. v. Bell Realty, Inc., No. 93 Civ. 4949 (LAP), 1995 WL 505891, at *3 (S.D.N.Y. August 23, 1995) (quoting Intern'l Halliwell Mines v. Continental Copper & Steel Indus., 544 F.2d 105, 108 (2d Cir. 1976) (internal quotation marks omitted)). As the Second Circuit recently confirmed while enforcing a release agreement against sophisticated commercial actors, such agreements may be voided on grounds of economic duress only in "extreme and extraordinary cases." VKK Corp. v. National Football League, 244 F.3d 114, 123 (2d Cir. 2001).

This is so regardless of evidence that one side enjoyed "a decided economic advantage" over the other at the moment the agreements were executed:

> Because an element of economic duress is . . . present when many contracts are formed or releases given, the ability of a party to disown his obligations under a contract or release on that basis is reserved for extreme and extraordinary cases. Otherwise, the stronger party to a contract or release would routinely be at risk of having its rights under the contract or release challenged long after the instrument became effective.

Id. See also Dufort v. Aetna Life Ins., 818 F. Supp. 578, 581 (S.D.N.Y. 1993) ("financial or business pressure of all kinds, even if exerted in the context of unequal bargaining power, does not constitute economic duress"). Therefore, to establish a claim of economic duress, a sophisticated party must "do more than merely claim that the other party knew about and used his

or her poor financial condition to obtain an advantage in contract negotiations." Id. at 582 (citing Kenneth D. Laub & Co. v. Domansky, 568 N.Y.S.2d 601, 602 (1991)). Rather, the plaintiff must demonstrate "that the defendant's actions deprived him of his free will, and that the ordinary remedy of an action for breach of contract would not be adequate." Berman v. Parco, No. 96 Civ. 0375 (KMW), 1996 WL 465749, at * 7 (S.D.N.Y. August 15, 1996).

The record in the instant case demonstrates (1) that HMS advanced to Davis a total sum of more than $2.5 million dollars, (2) that HMS never received a penny in return for these advances, and (3) that the Agreements expressly authorized HMS to shut its advance funding tap if Davis's outstanding balance reached $500,000. On those facts, HMS's demand that Davis execute a release in exchange for the June Funding cannot, as matter of law, amount to economic duress.

A. Wrongful Threat

"It is axiomatic that [a party] cannot be guilty of economic duress for failing to grant further forbearance when they had no legal duty to do so." MLI Indus. v. New York State Urban Dev. Corp., 613 N.Y.S. 2d 977, 980 (3d Dep't 1994) (citing 805 Third Avenue Co. v. M.W. Realty Assocs., 58 N.Y.2d 447, 451 (1983)). See also Worth Construction, 2001 WL 209924, at *5 ("[It is] well established that the threatened exercise of a legal right cannot constitute economic duress"). Thus, because the terms and conditions of the Agreements conclusively establish that HMS had a legal right to refuse further funding to Davis, there is no triable issue of fact as to whether HMS's demand for a comprehensive release agreement before advancing the June Funding constituted a "wrongful threat" for purposes of establishing economic duress. See, e.g., Cooper Development Co. v. Friedman, No. 92 Civ. 7572 (JSM), 1994 WL 62846, at *4 (S.D.N.Y. 1994) ("Under New York Law, threats to enforce a party's legal rights under a contract

9

– or even that party's interpretation of its rights – cannot constitute a wrongful threat sufficient to establish a claim of economic duress") (citing DiRose v. PK Management Corp., 691 F.2d 628, 633 (2d Cir. 1982)).

Davis's argument that HMS had an unconditional obligation to advance the June Funding is entirely conclusory and unsupported by the evidentiary record. First, it is not disputed that at the time of Davis's requests for the June Funding, Davis had an outstanding balance on advances received from HMS of more than $1.9 million (D.'s R. 56.1 Statement ¶¶ 10, 14, 16; P.'s R. 56.1 Counter Statement ¶¶ 10, 14) – well in excess of what the Agreements established as the trigger for HMS to refuse further advance funding (Compl. Exs. A §3(e) & B § 3(e)). Second, the Agreements expressly contemplated that HMS would only fund projects for which a budget had already been approved by both Davis and HMS. Specifically, Section 3(a)(ii) of the Agreements limited "approved expenses" to those expenses "included within an annual budget delineated by month as approved by HMS and Davis." (Compl. Ex. A & B) (emphasis added.) Likewise, HMS was obligated to advance only such funds that were "included in approved budgets" (id. § 3(e)), and the section delineating a schedule for repayment by Davis confirmed that HMS would only advance payments that had first "[been] included in budgets approved by HMS and Davis" (id. § 3(g)(i)) (emphasis added). Nowhere does the contract state that HMS would be obligated to advance funds for any budget proposal that Davis chose to submit, regardless of whether or not HMS approved. And it is agreed that although Davis provided preliminary budgets, none of these budgets were "in line with the pro forma budgets which had been previously set forth by HMS," and that as a result none were approved by HMS. (D.'s R. 56.1 Statement ¶ 9; P.'s R. 56.1 Counter Statement ¶ 9.) For these reasons, there is no evidence in the record supporting the

charge that HMS was obligated to advance Davis's June payroll expenses for a project that was never approved by HMS. Consequently, there is no evidence that Davis was forced to agree to the Release by means of wrongful threat.

### B. Exercise of Free Will

Even if the Court were to assume, as Davis argues, that it was "wrongful" for HMS to demand certain conditions in exchange for its advance of Davis's June payroll expenses, there is insufficient evidence to raise an issue of fact as to whether the threatened economic loss precluded Davis from exercising its free will and judgment before signing the Release. See, e.g., Jonassen v. Banker's Trust Co., No. 90 Civ. 2242 (LBS), 1990 WL 180150, at *3 (S.D.N.Y. Nov. 13, 1990) ("A claim of economic duress will lie only where a defendant's threat is so coercive as to preclude the exercise of free will by the plaintiff") (emphasis added) (quoting 805 Third Avenue, 58 N.Y.2d at 451). To demonstrate a preclusion of free will, Davis must show that it would have suffered "irreparable harm" absent receipt of the June Funding. See, e.g., Dollar Dry Dock Savings Bank v. Hudson Street Dev. Assocs., No. 92 Civ. 3737 (SAS), 1995 WL 412572, at *7 (S.D.N.Y. July 12, 1995) ("A threat to breach an enforceable contract can constitute duress only if the breach will cause irreparable harm to the threatened party and there are no adequate remedies at law") (citing Neuman v. Pike, 591 F.2d 191, 194 (2d Cir. 1979)).

Davis claims no more than that HMS's refusal to advance the June Funding "adversely affected Davis & Associates" (Davis Aff. ¶ 8) (emphasis added). Such adverse affects were allegedly caused by HMS's earlier advances of over $1.7 million for Davis to meet its payroll and marketing expenses (¶ 9). On the basis of those earlier advances, and Davis's own expectation that they would continue, Davis had retained a large staff whose pay was dependant upon HMS

11

funds. (Id. ¶¶ 9 & 10.) There is no evidence in the record that this staff was working on a project that was to be funded pursuant to any budget previously approved by HMS, and the Agreements make clear that without an approved budget in place "any and all costs, expenses, or liabilities . . . incurred by either HMS or [Davis] in connection with this Agreement and any client contracts covered by this Agreement, and the implementation thereof, shall be borne by the party incurring such expense." (Compl Exs. A §9 & B §9.) The Complaint further alleges that Davis has been forced to "deplete[] its own funds to finance its marketing and operating activities" (Compl. ¶ 20), and had "lost customer goodwill from not being able to fully perform and pursue its customer contracts" (id.).

A reasonable factfinder could not find the alleged threat of Davis's failure to meet payroll obligations for one pay period, standing alone, rose to the "extreme and extraordinary" circumstance under which a sophisticated party may lawfully "disown his obligations under a contract or release." National Football League, 244 F.3d at 123. Nor is it clear how a reasonable factfinder might find the alleged threat of depleted funds or lost costumer confidence to have precluded a sophisticated party like Davis from exercising its free will and judgment before signing the Release. See, e.g., Warnaco Inc. v. Farkas, 872 F.2d 539, 546 (2d Cir. 1989) (threat of economic loss does not preclude exercise of free will); Orix Credit Alliance, Inc. v. Hanover, 582 N.Y.S.2d 153, 154 (1st Dep't 1992) ("financial or business pressure of all kinds . . . does not constitute economic duress") (citations omitted).

Although "there is no line of absolute demarcation" between a threat that deprives a party of its free will as opposed to a threat that portends some lesser degree of harm, any "finding of duress at least must reflect a conviction that one party to a transaction has been so improperly

imposed upon by the other that a court should intervene." Hellenic Lines, Ltd. v. Louis Dreyfus Corp., 372 F.2d 753, 758 (2d Cir. 1967). See also Endriss v. Eklof Marine Corp., No. 96 Civ. 3137 (KMW), 1998 WL 1085911, at *5 (S.D.N.Y. July 28, 1998) (same) (quoting Hellenic Lines). On the instant record, the Court finds no genuine issues of fact that could support such a conviction. Absent an express agreement that HMS would continue to pour millions of dollars into Davis's operations without any prospect of immediate return on its investment (an agreement that did not exist), HMS's insistence that any funding of Davis's operations in addition to the more than $1.9 million already advanced must be conditioned upon Davis's accepting certain conditions favorable to HMS, is entirely reasonable and does not, as a matter of law, raise a triable claim of economic duress, whether or not additional funding was necessary to meliorate Davis's precarious economic position. See, e.g., Dufort, 818 F. Supp. at 581 ("A party raising economic duress must do more than merely claim that the other party knew about and used his or her poor financial condition to obtain an advantage in contract negotiations"). Davis was on notice as early as June 1, 2000, that future advance funding of its payroll expenses might come with conditions attached. (P.'s R. 56.1 Counter Statement ¶¶ 9 & 10.) Yet there is no evidence that Davis took any steps to secure alternative sources of funding, or to ensure that it would be solvent prior to requesting another advance from HMS, thirty days later. On these facts, the threatened irreparable harm set forth in the Davis Affidavit simply does not establish a basis upon which reasonable jurors might find the necessary preclusion of plaintiff's free will and judgment at the time it executed the Release. See, e.g., City of New York v. 17 Vista Assocs., 580 N.Y.S.2d 963, 968 (N.Y. Co. Sup. Ct. 1991) ("A sophisticated [party] is not 'deprived of its free will' simply because it finds itself in a legal cul-de-sac, withdrawal from which will inevitably cost it money, where the

[party] had constructive (and some actual) notice of the problems looming on the horizon") (citing Sadowsky v. City of New York, 732 F.2d 312, 318 (2d Cir.1984)).[3]

### C. Ratification of the Release

Finally, even if the Release were otherwise voidable by reason of economic duress, the Court would enforce the Release because plaintiff ratified it. "A party may ratify a contract or release entered into under duress by intentionally accepting benefits under the contract." National Football League, 244 F.2d at 122. See also Pocchia v. Prudential Ins. Co., 74 F. Supp. 2d 240, 251 (S.D.N.Y. 1999) ("Because economic duress renders a contract voidable, but not void, the proponent of the duress defense must also show that he did not acquiesce to the contract by ratifying it").

There is no dispute on this record that (1) HMS advanced Davis $685,000 immediately upon execution of the release agreement (P.'s R. 56.1 Counter Statement ¶ 14), (2) Davis agreed to execute the release agreement in consideration for that sum plus a promise of up to $315,000 of

---

[3] Nor could a reasonable factfinder conclude that Davis had no available legal remedies, or that a breach of contract action was impossible when the release was executed. See, e.g., Nelson v. Blacker, 713 F. Supp. 107, 109 (S.D.N.Y. 1989) ("In order to prevail on a claim of economic duress, plaintiff must show, inter alia, that he had available no legal remedies to avoid the duress") (internal citations omitted). Undoubtedly, Davis could have resorted to legal process to enforce the agreement that it now claims was breached. HMS required its first release (of Davis's claim to stock options) when Davis demanded advance payment to cover its payroll on June 1, 2000. The release that is now the focus of this opinion was not executed until June 30, 2000. Davis therefore had time within the intervening thirty days to secure alternative funding or to resort to legal process to enforce what it now claims were its rights pursuant to the Agreements. It did not do so, and therefore cannot now claim that its execution of a comprehensive release in exchange for receipt and retention of over half a million dollars was the result of economic duress applied by HMS. See, e.g., Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank, 755 F.2d 239, 251 (2d Cir. 1984) ("In order to prevail on such a claim [of economic duress] the plaintiff must show, inter alia, that it had available no legal remedies to avoid the duress").

additional funding (id.), and (3) not a penny of the $685,000 (or of any of the more than $2.5 million in total advance payments) was ever returned to HMS. Those facts alone constitute ratification of the Release by Davis. See, e.g., Liberty Marble, Inc. v. Elite Stone Setting Corp., 670 N.Y.S.2d 836, 838 (1st Dep't 1998) ("Moreover, even if duress were sufficiently set forth, it is undisputed that [plaintiff] took the $101,000, thereby ratifying the release") (internal citations omitted).

Davis argues in its brief, however, that it is not required to return the funds and that its failure to do so does not amount to ratification of the Release, since it "is still suffering economic harm from HMS's breach of its contractual obligations." (P.'s Mem. at 16.) But for a release to be voided where the party claiming duress has accepted and retains a benefit received in consideration for its execution, "the disaffirming party [must] still [be] under the same continuing duress." Sosnoff v. Carter, 568 N.Y.S.2d 43, 47 (1st Dep't 1991) (citing 13 Williston on Contracts, §§ 1624, 1627 (3d ed.); Restatement (Second) of Contracts § 381; Austin Instrument, Inc. v. Loral Corp., 29 N.Y.2d 124, 133 (1971)). There is no evidence on this record that Davis continues to languish under the "same continuing duress" sufficient to release its obligation to return HMS's money. Nor is there evidence that Davis – which still has not returned any of HMS's money – ever sought out alternative sources to fund its payroll expenses. See, e.g., Int'l Hallilwell Mines, Ltd. v. Continental Copper & Steel Indus., Inc., 544 F.2d 105, 108 (2d Cir. 1976) (party who accepts benefits under settlement agreement and "fails to show that any necessary financial help . . . could not have been obtained from some alternative source" is precluded from voiding the agreement on grounds of economic duress). Consequently, Davis is precluded from disowning its obligations under the release on grounds of economic duress.

## CONCLUSION

Defendant HMS's motion for summary judgment is granted, and judgment will be entered for the defendant on all remaining causes of action.

SO ORDERED:

Dated:    New York, New York
         May 1, 2001

*[signature]*
GERARD E. LYNCH
United States District Judge